UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAMELA S. HARMON,

                            Plaintiff,

                                                          Case # 17-CV-171-FPG
v.

                                                          DECISION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

## INTRODUCTION

Pamela S. Harmon brings this action pursuant to the Social Security Act ("the Act")

seeking review of the final decision of the Acting Commissioner of Social Security that denied her

applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI")

under Titles II and XVI of the Act.  ECF No. 1.  The Court has jurisdiction over this action under

42 U.S.C. §§ 405(g), 1383(c)(3).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c).  ECF Nos. 8, 12.  For the reasons that follow, the Commissioner's motion is

GRANTED and Plaintiff's motion is DENIED.

## BACKGROUND

On November 5, 2013, Harmon applied for DIB and protectively applied for SSI with the

Social Security Administration ("the SSA").  Tr.[1] 179-206.  She alleged disability since December

31, 2012 due to a traumatic brain injury ("TBI"), neurological disorders, memory loss, headaches

and migraines, a left eye impairment, and hearing loss.  Tr. 226.  On May 10, 2016, Harmon and

a vocational expert ("VE") appeared and testified at a hearing before Administrative Law Judge

---

[1] References to "Tr." are to the administrative record in this matter.

Bryce Baird ("the ALJ"). Tr. 29-76. On September 6, 2016, the ALJ issued a decision finding

that Harmon was not disabled within the meaning of the Act. Tr. 13-23. On January 27, 2017, the

Appeals Council denied Harmon's request for review. Tr. 1-4. Thereafter, Harmon commenced

this action seeking review of the Commissioner's final decision. ECF No. 1.

## LEGAL STANDARD

### I.     District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the

SSA's conclusions were supported by substantial evidence in the record and were based on a

correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation marks

omitted); *see also* 42 U.S.C. § 405(g). The Act holds that a decision by the Commissioner is

"conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence

means more than a mere scintilla. It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)

(quotation marks omitted). It is not the Court's function to "determine *de novo* whether [the

claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quotation marks

omitted); *see also Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990)

(holding that review of the Secretary's decision is not *de novo* and that the Secretary's findings are

conclusive if supported by substantial evidence).

### II.    Disability Determination

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is

disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71

(1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful

work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ

proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). 20 C.F.R. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement (20 C.F.R. § 404.1509), the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. *See* 20 C.F.R. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

**DISCUSSION**

**I.     The ALJ's Decision**

The ALJ's decision analyzed Harmon's claim for benefits under the process described above.  At step one, the ALJ found that Harmon had not engaged in substantial gainful activity since the alleged onset date.  Tr. 15.  At step two, the ALJ found that Harmon has the following severe impairments: TBI, depression, anxiety, and cervicalgia. Tr. 15-16.  At step three, the ALJ found that these impairments, alone or in combination, did not meet or medically equal any Listings impairment.  Tr. 16-17.

Next, the ALJ determined that Harmon retains the RFC to perform medium work[2] with additional limitations.  Tr. 17-20.  Specifically, the ALJ found that Harmon can lift and carry 50 pounds occasionally and 25 pounds frequently; can sit for six hours and stand and walk for four hours in an eight-hour workday; can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds; can occasionally balance and frequently kneel or crouch, but can never crawl; can tolerate only moderate noise levels; cannot be exposed to hazards like unprotected heights or moving machinery; and is limited to jobs that do not require near and far visual acuity with the left eye.  Tr. 17-18.  As to Harmon's mental capacity, the ALJ found that she requires simple, routine tasks that can be learned after a short demonstration or within 30 days; cannot travel to unfamiliar places; can occasionally interact with the public and frequently interact with coworkers; and is limited to work that requires the same tasks everyday with little variation in location, hours, or tasks.  Tr. 18.

---

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, [the SSA] determine[s] that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c), 416.967(c).

At step four, the ALJ relied on the VE's testimony and found that Harmon cannot perform her past relevant work.  Tr. 21.  At step five, the ALJ relied on the VE's testimony and found that Harmon can adjust to other work that exists in significant numbers in the national economy given her RFC, age, education, and work experience.  Tr. 21-22.  Specifically, the VE testified that Harmon could work as an office helper, mail clerk, and document preparer.  Tr. 22.  Accordingly, the ALJ concluded that Harmon was not "disabled" under the Act.  Tr. 22-23.

## II.     Analysis

Harmon argues that remand is required because the ALJ (1) violated the treating physician rule; (2) relied on a fraudulent opinion from a consultative examiner; and (3) erred at step three in evaluating her impairments under the Listings.  ECF No. 8-1 at 10-17.  These arguments are addressed in turn below.

### A.     Treating Physician Rule

Harmon argues that the ALJ violated the treating physician rule when he gave "limited weight" to the opinion of her treating physician Ann Wands,  M.D. without providing the requisite good reasons for doing so.  ECF No. 8-1 at 10-12.  Harmon also asserts that the ALJ should have re-contacted Dr. Wands to obtain additional support for her opinion.

#### i.     Good Reasons

The "treating physician rule" is "a series of regulations set forth by the Commissioner . . . detailing the weight to be accorded a treating physician's opinion." *De Roman v. Barnhart*, No. 03 Civ. 0075 (RCC) (AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003) (citing 20 C.F.R. § 404.1527); 20 C.F.R. § 416.927.  Under this rule, the ALJ must give controlling weight to a treating physician's opinion when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). While an ALJ may discount a treating physician's opinion if it does not meet this standard, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion.").

Even when a treating physician's opinion is not given "controlling" weight, the ALJ must still consider several factors in determining how much weight it should receive. The ALJ must consider "the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the relevant evidence, particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (quotation marks, alterations, and citations omitted); *see also* 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

Dr. Wands completed a "Multiple Impairment Questionnaire" on November 24, 2013 in which she evaluated how Harmon's impairments affect her ability to work. Tr. 621-28. Dr. Wands indicated that she had been treating Harmon for three months for TBI, depression, and pain. Tr. 621. Dr. Wands opined that Harmon can sit, stand, and walk no more than one hour in an eight-hour workday. Tr. 623. She also opined that Harmon can lift and carry over 50 pounds occasionally and up to 10 pounds frequently. Tr. 624. Dr. Wands concluded that Harmon's symptoms would constantly interfere with her attention and concentration, that she could tolerate

only "very low" work stress, and that she would constantly need unscheduled breaks at unpredictable intervals during the workday. Tr. 626.

The ALJ summarized Dr. Wands's opinion and, in accordance with the regulations, acknowledged the treating relationship between Dr. Wands and Harmon. Tr. 20; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (noting that the ALJ will typically give more weight to a medical opinion from the claimant's treating source). Despite the treating relationship, the ALJ nonetheless concluded that Dr. Wands's opinion was entitled to only "limited weight" because "it is not fully consistent with the overall medical evidence . . . which showed [that Harmon] retained full strength of the upper and lower extremities, thus allowing for higher abilities with sitting, standing, and walking." Tr. 20.

The ALJ was entitled to discount Dr. Wands's opinion based on its inconsistency with the other record evidence. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (noting that an ALJ will give more weight to a medical opinion that is consistent with the record as a whole). The ALJ explained, for example, that Harmon demonstrated normal gait and stance, could walk on her heels and toes without difficulties, and had normal musculoskeletal findings at a consultative examination. Tr. 19 (citing Tr. 708-09). She also had normal neurological findings, including physiologic and equal deep tendon reflexes, no sensory deficits, and full strength in the upper and lower extremities. *Id.* (citing Tr. 709). Similarly, Harmon had normal neurological findings, intact reflexes, and full strength in her upper and lower extremities at a physical examination in September of 2015. Tr. 19 (citing Tr. 753, 755). This medical evidence supports the ALJ's conclusion that Dr. Wands's opinion unduly restricted Harmon's ability to sit, stand, and walk.

### ii.       Contacting Dr. Wands

Harmon also asserts that the ALJ "had a duty to re-contact Dr. Wands and inquire as to whether she had additional support for her findings." ECF No. 8-1 at 12. An ALJ may be required to "recontact a treating physician to clarify his or her opinion where it 'contains conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.'" *Allen v. Colvin*, No. 3:14-CV-1368, 2016 WL 1261103, at *12 (N.D.N.Y. Mar. 30, 2016) (quoting 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1)). This rule applies, however, where a medical source's opinion is *internally inconsistent*, not where it is inconsistent with other evidence in the record. *See, e.g.*, *Allen*, 2016 WL 1261103, at *12 (finding that the ALJ should have contacted the plaintiff's treating physician for clarification before he discounted that opinion due to an internal inconsistency); *Romero v. Colvin*, No. 11-CV-3920 (ENV), 2016 WL 74820, at *4 (E.D.N.Y. Jan. 6, 2016) ("[T]o the extent that the ALJ perceived internal inconsistencies in [the treating physician]'s opinion, he was obliged to recontact [the treating physician] and attempt to resolve them."); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (holding that "even if the [treating physician's] clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician]").

Here, the ALJ did not discount Dr. Wands's opinion because it was internally inconsistent, lacked information, or was not well supported by her objective findings. Tr. 20; *see* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (an ALJ will give more weight to a medical source's opinion who presents relevant evidence and a thorough explanation to support her opinion). Rather, the ALJ discounted Dr. Wands's opinion because it was inconsistent with the *record as a whole*. Tr. 20; *see* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (an ALJ will give more weight to an opinion that

is consistent with the record as a whole).  Thus, the ALJ was not obligated to contact Dr. Wands.

Moreover, it appears that the record was adequately developed as it contains nearly 800 pages of

medical evidence, including numerous treatment notes and at least three medical source opinions

aside from Dr. Wands's opinion.  *See, e.g.*, Tr. 92-104, 678-82, 708-11; *Rosa v. Callahan*, 168

F.3d 72, 77 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record,

and where the ALJ already possesses a complete medical history, the ALJ is under no obligation

to seek additional information in advance of rejecting a benefits claim.") (quotation marks and

citation omitted).

Accordingly, for the reasons stated, the Court finds that the ALJ did not violate the treating

physician rule and that he properly analyzed Dr. Wands's opinion.

### B.      Consultative Examiner's Opinion

Harmon also argues that the ALJ should not have relied on the opinion of consultative

examiner Kristina Luna, Ph.D.—who found that Harmon did not have significant mental

limitations—because it "was obtained through fraud or similar fault, and must be disregarded."

ECF No. 8-1 at 13.

The Act provides that the SSA "must immediately redetermine an individual's entitlement

to [Social Security benefits] if there is reason to believe that fraud or similar fault was involved in

the individual's application for benefits."  S.S.R. 16-1P, 2016 WL 1029284, at *2 (S.S.A. Mar. 14,

2016); *see also* S.S.R. 16-2P, 2016 WL 1029285, at *2 (S.S.A. Mar. 14, 2016).  The SSA must

disregard evidence, including that provided by a medical source, "if there is reason to believe that

fraud or similar fault was involved in providing that evidence."  S.S.R. 16-1P, 2016 WL 1029284,

at *2.

"Fraud" exists when a person intentionally makes, or causes to be made, a false statement or misrepresentation of a material fact, or conceals or fails to disclose a material fact for use in determining disability. *Id.* at *3. "Similar fault" exists if an incorrect or incomplete statement material to a disability determination is knowingly made or concealed. *Id.* The SSA "cannot base a finding of similar fault on speculation or suspicion." S.S.R. 16-2P, 2016 WL 1029285, at *3. Fraud or similar fault must be proven by a preponderance of the evidence, which is evidence that "produces the stronger impression and is more convincing as to its truth when weighed against the evidence in opposition." *Id.* at *4.

Harmon's attorney asserts that Dr. Luna's opinion is "faulty" because

> [i]n eighteen years of practicing Social Security Disability Law, [he] ha[s] yet to see a report from [a consultative examiner] that says that a claimant has any significant mental limitations. These examinations are often completed within 10 minutes or less, and the report is the same whether the subject has a listing-level intellectual disability or a reactive depression from being out of work.

ECF No. 8-1 at 13. Harmon also asserts in a conclusory fashion that Dr. Luna provided an "inadequate examination and a boilerplate opinion" that resulted in an "incorrect or incomplete" statement of Harmon's RFC, and therefore it should be "stricken from the record." *Id.* at 14. Harmon offers no actual evidence demonstrating that Dr. Luna's opinion was fraudulent or faulty.

In fact, the record reveals that Dr. Luna fully examined Harmon. Tr. 678-82. Her report summarizes Harmon's background information, psychiatric and physical histories, current functioning, and drug, alcohol, legal, family, and military histories. Tr. 678-79. Dr. Luna also conducted a mental status examination and made findings as to Harmon's appearance, speech, thought processes, affect, mood, sensorium, orientation, attention and concentration, recent and remote memory skills, cognitive functioning, insight, and judgment. Tr. 679-80. Her report also described Harmon's mode of living and adaptive functioning. Tr. 680-81. Finally, although

Harmon characterizes her opinion as "boilerplate," Dr. Luna provided a thorough and specific opinion as to Harmon's ability to perform mental work-related functions. Tr. 681.

The ALJ afforded "significant weight" to Dr. Luna's opinion because it is consistent with her examination findings and other treatment notes of record, both of which are appropriate reasons to rely on that opinion. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (an ALJ will give more weight to a medical source's opinion who presents relevant evidence and a thorough explanation to support her opinion); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (an ALJ will give more weight to an opinion that is consistent with the record as a whole). Moreover, "[i]t is well established that an ALJ may rely on the medical opinions provided by State agency consultants and that those opinion[s] may constitute substantial evidence." *Barber v. Comm'r of Soc. Sec.*, No. 6:15-CV-0338 (GTS/WBC), 2016 WL 4411337, at *7 (N.D.N.Y. July 22, 2016) (citations omitted).

Accordingly, there is no reason to believe that Dr. Luna's opinion was obtained by "fraud or similar fault" and the Court finds that the ALJ did not err when he relied on her opinion.

**C.      Step Three**

Finally, Harmon asserts that the ALJ erred at step three when he failed to properly discuss whether her impairments met or medically equaled the Listings. ECF No. 8-1 at 15-17.

At step three of the disability analysis, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a Listings impairment. 20 C.F.R. §§ 404.1520(d); 416.920(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement (20 C.F.R. §§ 404.1509, 416.909), the claimant is disabled. If not, the ALJ determines the claimant's RFC and proceeds to the next steps of the analysis. 20 C.F.R. §§ 404.1520(e)-(f); 416.920(e)-(f).

To match an impairment in the Listings, the claimant's impairment "must meet all of the specified medical criteria" of a Listing. *Barber v. Comm'r of Soc. Sec.*, 6:15-CV-0338 (GTS/WBC), 2016 WL 4411337, at *3 (N.D.N.Y. July 22, 2016) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* An impairment may also be "medically equivalent" to a listed impairment if it is "at least equal in severity and duration to the criteria of any listed impairment." *Id.* (citation omitted).

An ALJ must explain why a claimant failed to meet or equal the Listings "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009) (citation omitted). Importantly, it is the ALJ's responsibility—and not the job of the Commissioner's attorney—to "build an accurate and logical bridge from the evidence to [his] conclusion to enable a meaningful review." *Hamedallah ex rel. E.B. v. Astrue*, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012). The Court "cannot . . . conduct a review that is both limited and meaningful if the ALJ does not state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered." *Id.* "Nevertheless, an ALJ's unexplained conclusion at step three of the analysis may be upheld where other portions of the decision and other clearly credible evidence demonstrate that the conclusion is supported by substantial evidence." *Yeomas v. Colvin*, No. 13-CV-6276P, 2015 WL 1021796, at *17 (W.D.N.Y. Mar. 10, 2015) (citation, quotation marks, and alterations omitted); *see also Berry v. Schweiker*, 675 F.2d 464, 468-69 (2d Cir. 1982) (affirming the ALJ's step three decision even though he did not set forth a specific rationale "since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence").

Here, the ALJ determined at step three that Harmon's impairments did not meet or medically equal the severity of the Listings. Tr. 16-17 (citing Tr. 699, 782, 790). Specifically, the ALJ considered Listings 11.08 (cerebral trauma), 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.06 (anxiety-related disorders).

### A.    Listing 11.08

The ALJ indicated that he "considered" Listing 11.08 and concluded that "the medical evidence does not document listing-level severity, and no medical source has mentioned findings equivalent in severity to the criteria." Tr. 16. The ALJ's step three analysis did not otherwise explain why Harmon did not meet the requirements of this Listing. Tr. 16-17.

Harmon argues that the ALJ erred by failing to further discuss Listing 11.08. ECF No. 8-1 at 16-17. The Commissioner acknowledges that the ALJ did not specifically discuss the criteria of Listing 11.08, but asserts that remand is not required because "the ALJ's written decision shows that he thoroughly considered Listing 11.08's criteria in finding that [Harmon] did not meet the Listing." ECF No. 12-1 at 26-27. The Court agrees.

At the time of the ALJ's decision, Listing 11.08 required that the claimant have spinal cord or nerve root lesions, due to any cause, with disorganization of motor function as described in Listing 11.04B. *See* 20 C.F.R. Part 404, Subpart P, App'x 1 at § 11.08 (effective May 24, 2016 to Sept. 28, 2016). Listing 11.04B explains that disorganization of motor function is "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Part 404, Subpart P, App'x 1 at § 11.04B.

As mentioned, the ALJ did not specifically discuss Listing 11.08 at step three. The Court finds, however, that the ALJ's RFC analysis reveals that he considered Listing 11.08 and that

substantial evidence supports his determination that Harmon did not meet the Listing. *See Hunt v. Astrue*, No. 07-CV-1029, 2009 WL 3076209, at *7 (N.D.N.Y. Sept. 23, 2009) ("While the ALJ did not elaborate on his findings in the portion of his decision addressed to step 3, the record contains substantial evidence supporting the ALJ's determination that Plaintiff did not meet the requirements of [the] Listing."); *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

The ALJ noted, for example, that Harmon demonstrated full strength in her upper and lower extremities on several occasions. Tr. 19 (citing Tr. 707, 709, 755); *see also* Tr. 614, 755, 776, 779, 785 (additional examinations revealing full strength in all extremities). The ALJ also observed that Harmon's consultative examination revealed that she had a normal gait and stance, could walk on her heels and toes without difficulty, and had normal musculoskeletal findings. Tr. 19 (citing Tr. 708-09); *see also* Tr. 614, 707, 776, 779, 785 (additional examinations revealing normal gait and station). The consultative examination also revealed that Harmon could get on and off the examination table without difficulty and that she walked without an assistive device. Tr. 708. Moreover, the record contains findings of normal strength and reflexes, no signs of incoordination in the upper or lower extremities, and full range of motion in the upper and lower extremities. Tr. 709, 785. Thus, the evidence shows that Harmon did not have significant and persistent disorganization of motor function in two extremities that disturbed her gross and dexterous movements or gait and station, as Listing 11.08 requires, and therefore the ALJ's step three finding that she did not meet Listing 11.08 is supported by substantial evidence.

Moreover, Harmon does not point to any record evidence suggesting that her impairments satisfy the severity requirements of Listing 11.08. *See Jasen v. Comm'r of Soc. Sec.*, No. 16-CV-6153P, 2017 WL 3722454, at \*12 (W.D.N.Y. Aug. 29, 2017) (citing *Beebe v. Astrue*, No. 5:10-CV-1467 (MAD), 2012 WL 3791258, \*4 (N.D.N.Y. Aug. 31, 2012) (finding that, even though the ALJ did not provide a "specific rationale" for his finding that plaintiff's spinal impairment did not meet a Listing, remand was not required because the plaintiff had not "established that she satisfied all the criteria symptoms of the Listing")) (other citations omitted).

Accordingly, for the reasons stated, the ALJ's finding that Harmon did not meet Listing 11.08 is supported by substantial evidence.

### B.    Listings 12.02, 12.04, and 12.06

Harmon argues that the ALJ erred by citing only testimony and "boilerplate statements" to support his analysis of Listings 12.02, 12.04, and 12.06. ECF No. 8-1 at 16.

Listings 12.02, 12.04, and 12.06 address organic mental disorders, affective disorders, and anxiety disorders. *See* 20 C.F.R. Part 404, Subpart P, App'x 1 at § 12.00(A) (effective May 24, 2016 to Sept. 28, 2016).[3] To meet one of these Listings, the claimant must satisfy the "paragraph B" criteria, which address a set of impairment-related functional limitations, or the "paragraph C" criteria, which the ALJ addresses only if he finds that the paragraph B criteria are not satisfied. *Id.*

To satisfy the paragraph B criteria, the claimant's mental impairments must cause a "marked" limitation[4] in at least two of the following areas: activities of daily living, maintaining

---

[3] The ALJ rendered his decision on September 6, 2016, and therefore this is the relevant version of these Listings for evaluating the severity of Harmon's mental impairments. On September 26, 2016, the SSA finalized new regulations revising this portion of its Listings, which went into effect on January 17, 2017. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138 (Sept. 26, 2016). The regulations provide the following instruction regarding retroactive application: "We expect that Federal courts review our final decisions using the rules that were in effect at the time we issued the decisions." *Id.* at 66138 n.1; *see also e.g.*, *Gushen v. Comm'r of Soc. Sec.*, No. 16-cv-10003, 2017 WL 1807605, at \*2 n.2 (E.D. Mich. Feb. 23, 2017).

[4] A "marked" limitation means more than moderate but less than extreme. 20 C.F.R. Part 404, Subpart P, App'x 1 at § 12.00(C).

social functioning, and maintaining concentration, persistence, or pace. *Id.* at § 12.00(C). The paragraph B criteria are also satisfied if the claimant has a "marked" limitation in one of these areas and has experienced "repeated" episodes of decompensation[5] each of extended duration. *Id.*

Here, the ALJ specifically discussed each paragraph B category. Tr. 16-17. As to daily activities, the ALJ found that Harmon has mild restrictions. Tr. 16-17 (citing Tr. 680-81, 708). Harmon reported that she lived alone and could perform daily personal care activities like showering, bathing, and dressing independently. Tr. 16-17. Although she reported that she could not cook, clean, do laundry, or shop, she nonetheless took care of her cats, could manage her own money, drive, and take public transportation. Tr. 17. Harmon also reported that she relied on her family and friends to help with household chores. *Id.*

As to social functioning, the ALJ found that Harmon has moderate difficulties. Tr. 17. Harmon could take public transportation and had family and friends she could rely upon. *Id.* (citing Tr. 678). During the mental status examination of her consultative psychiatric evaluation, however, Harmon was irritable, loud, argumentative, and had an overall poor manner of relating and poor social skills. *Id.* (citing Tr. 679-80).

As to concentration, persistence, and pace, the ALJ found that Harmon has moderate difficulties. Tr. 17. Harmon alleged and reported difficulties with concentration, excessive apprehension, worry, and hyperstartled response. *Id.* (citing Tr. 678). Nonetheless, Harmon's consultative psychiatric evaluation revealed coherent and goal-directed thought processes and only mildly impaired attention, concentration, and memory. *Id.* (Tr. 679-80).

Finally, the ALJ noted that Harmon experienced no episodes of decompensation of extended duration. Tr. 17. Accordingly, because Harmon's mental impairments did not cause at

---

[5] "Repeated" episodes of decompensation, each of extended duration, means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.* at § 12.00(C)(4).

least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ concluded that the paragraph B criteria were not satisfied. *Id.*

Because the paragraph B criteria were not satisfied, the ALJ went on to consider the paragraph C criteria. *Id.* The paragraph C criteria require: as to Listing 12.02, the inability to sustain even a minimal increase in mental demands without decompensation; as to Listings 12.02 and 12.04, the inability to live outside of a highly-supportive living arrangement; and as to Listing 12.06, the inability to function independently outside of one's home. *See* 20 C.F.R. Part 404, Subpart P, App'x 1 at §§ 12.02, 12.04, 12.06. The ALJ specifically indicated that there is no evidence that Harmon suffers from repeated episodes of decompensation, that any marginal adjustment or minimal increase in mental demands or change in environment would cause decompensation, or a current history of one or more years inability to function outside a highly supportive living arrangement. Tr. 17. The ALJ also noted that there is no evidence that Harmon cannot function outside a highly supportive living arrangement. *Id.* Thus, the ALJ concluded that the evidence did not satisfy the paragraph C criteria.

Finally, Harmon does not point to any evidence to suggest that her mental impairments satisfy the requirements of any of these Listings. *See Jasen*, 2017 WL 3722454, at *12 ("Moreover, [the plaintiff] points to no evidence in the record to suggest that his impairments in fact satisfy the severity requirements of any of the Listings. Accordingly, remand is not required.").

Accordingly, the Court finds that the ALJ's determination that Harmon did not meet Listings 12.02, 12.04, and 12.06 is supported by substantial evidence.

## CONCLUSION

The Commissioner's Motion (ECF No. 12) is GRANTED and Plaintiff's Motion (ECF No. 8) is DENIED.  Plaintiff's Complaint (ECF No. 1) is DISMISSED WITH PREJUDICE.  The Clerk of Court is directed to enter judgment and close this case.


IT IS SO ORDERED.

Dated: April 1, 2018
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court